Thank you for being interested enough to hear our case live. I know this is a live panel, so I'll start out, but I'm prepared to be bombarded. We've done our homework. Okay. There's a lot of topics here, but I want to start out with the chronology and what we think are issues of applying University of Washington, and in this case, given the history in Phoenix Memorial and in the initial case in Portland. I'd like to, by the way, reserve five minutes. Okay. Go ahead. I'm sorry, Mark. No, no, no. Hang on a second. Set it at 15, not 10. There we go. We'll keep your morning less boring. There you go. As a wise jurist named Tolman once said in the 20th Century Fox case. I always hate it when they quote me. What did I say? As a general rule, a panel not sitting on bank may not overturn circuit court precedent, and the precedent involved in that case was an interpretation of a statute, and one panel decided the statute meant the parties argued that the panel's interpretation of the statute should be disregarded in light of intervening precedents in other cases, and this court said that's not the way we do business here, and I think that's a big part of what we want to say today. In the legacy of manual cases, this is a really complicated area, so I'm going to try to simplify it to the extent that that's possible, although that's a chore. This court first dealt with these issues in legacy of manual, and that was a case where the government, which has never been particularly hospitable to disproportionate share of hospitals and adjustments, said, we don't care if the person is eligible for Medicaid. We look at whether the days are paid. We look at whether there's money going with the days, and this court said no in legacy of manual. If somebody's eligible for Medicaid, you have to count the day, whether or not the days are paid. We then move on to Portland and Venice, and this court was faced with the prospect of individuals who, at that time, were in an 1115 waiver project, and their services, their inpatient services were covered as under Title XIX, but the individuals weren't eligible. And my former colleagues from the government argued that that doesn't cut it. The days have to be – people have to be medically needy, they have to be categorically needy, and that is the scope of the statute, and if somebody doesn't satisfy those enumerated criteria, then you can't count the days. And this court said no. Mr. Gallant, the principle that I discern from the cases is that you either have to be eligible and covered or you have to be the beneficiary of one of these secretarial approvals under, what is it, Section 15? 1115. 1115. And if you don't fall into those two categories, then you're not covered. So can you help me? Yeah, because – Can you help me with that issue? Sure, because in – Because I think that's what the case turns on. Well, in Portland and Venice, and again, this is – there's a lot of fractured pieces here, but Portland and Venice involved a period of time before 1115 days were covered in the manner that you said. And this court said we don't really care, Secretary, whether you've pronounced these days covered, because as far as the Ninth Circuit is concerned, when these individuals are funded under a state plan, they are covered. They're receiving medical assistance under a state plan. Phoenix Memorial then went on and said in crisper terms, I think, than Portland and Venice, you know, we hold that it's clear and unambiguous that if you were funded under Title 19, that is deemed to be medical assistance. And the reason the Secretary decided in 2000 to cover 1115 waiver individuals going forward was because they were going to be regarded as funded. And it was the funding that caused the inclusion of that 1115 waiver. Is it the funding or the eligibility? It's not eligibility. Well, let me ask the rest of the question. I thought that the real problem here that the government was balking at was that a state like Washington, which has a big heart and has been very generous to low-income patients who need medical care, but are nonetheless above the cutoff line for eligibility for Medicare and Medicaid, basically the state has tried to enact health care coverage as part of the safety net for the citizens, but that the feds are balking at that because the Secretary of Health and Human Services doesn't get a say in who the state determines to be eligible for coverage, and they're not eligible under the guidelines that Congress has enacted. And I think I've encapsulated the state. Right, and with no disrespect to the HHS or the feds, that's a bunch of kerfluie. Why? Well, it's not accurate. If you look at the regulation, and you have to look at what the Secretary says, you know, we still operate under SEC versus Chenery. It's not a matter of a court picking out a rationale and propping up the Secretary's position. In 2000, when the Secretary decided to, so first of all, we have 9962. It's the government's manual before the 2000 regulation. And it says GA patients, charity care patients, and 1115 waiver patients who are not eligible for Medicaid cannot be counted. There's three places in that manual where all of those categories are treated as identical, as indistinguishable. Then the Secretary had a revelation in 2000 and said, you know, the purpose of this thing is not to be so hyper-technical. It's to protect the hospitals that treat low-income patients. And the 1115 waivers cover only low-income patients once they're part of a waiver process. But the notion that Medicaid dish-covered individuals are not subject to secretarial approval, that's, I don't want to say the lie, but that's the misconception. But as I understand how the Medicaid program, the state gets a block grant, a sum of money from HHS to pay for Medicaid patients, right? And that's fine as long as the patients meet Medicaid eligibility requirements. But what do we do with a situation which we apparently have in Washington where the state decides to be more generous than Congress has been with regard to setting eligibility for coverage under Medicaid? Well, every state more or less, I'm not sure about Arizona, but most states have been more generous since 1987, when a year after the Medicare dish statute, Congress enacted the Medicaid dish statute. And at that point, Congress added the Medicaid dish provision and said, don't just provide Medicaid payments for the enumerated categories. We now want the states to be able, subject to our approval, to cover additional low-income patients through Medicaid dish. And then that has to be approved. But doesn't the approval trigger the Section 1511? No, no, that's not, that's a misconception. There's, these are basically. But what is it, I guess I don't understand, what is it that the Secretary is approving? Because as I read your briefs, I think there was a concession that the Secretary has not approved this class of charity care for Washington State. Absolutely not. In fact, the Secretary's approval is in the record. It's the state plan amendments, which in 1991 and 1992 respectively, approved these two categories of payment. It's record ER 1130, or it's 1134, which is called medically indigent disproportionate share hospital, M.I. dish. And the document in the record says approval date 52693, effective 10192. That's the state plan amendment. And guess who it was approved by? The Secretary. If you flip to the next page, it's 571. That's the GAU dish program. And then if you flip to the next page, which is record 1136, it says transmittal 9225, approval date 52693, effective 10192. So in order for these categories to have been reimbursable to Washington State, they had to be packaged as part of a Medicaid dish adjustment to the state plan amendment. That Medicaid state plan amendment isn't effective unless it's approved by the Secretary. So the notion that an 1115 waiver, which is really, if you play this game on a regular basis, what you know is that states use 1115 and traditional Medicaid almost interchangeably, which is why the Secretary, in all the manuals before 2000, lumped all these categories together as though they were unitary. So they're basically poor people who are not eligible for Medicaid. These two categories in Washington, they have maximum incomes of 100 percent of the federal poverty level. They are poorer people than waiver people. I've got to jump in because the only reason I showed up to hear you talk is to understand why you think we can get around our earlier decision. You haven't yet addressed that, it seems to me. Everything you're saying makes perfect sense if we were working on a blank slate. But I view that decision as having decided the precise arguments that you want to put forward. So how do we get around that decision? I think it's not a blank slate. I think it's kind of a fractured slate. And the reason for that is what I refer maybe a little too cleverly to as the improvident concession. When this case was argued where, and by the way, we have issues of precedent, we have issues of collateral estoppel. Collateral estoppel, we've got nine hospitals here that have nothing to do with Medicaid. I'm just talking about we have a decision that's directly on point. The decision in that case, ironically, construes the identical provision of the same statute as clearly meaning under Chevron 1 the opposite of what two prior decisions of this panel construed it as. So I guess what I'd say is I'm not quite sure how one got to University of Washington except for the concession. And we quoted in our brief. Where in the opinion is there a reference to the concession? There's not even a reference to Portland and Venice except to say the standard review is de novo. Who cares what somebody said at oral argument? Nobody's going to care what you're saying today once the opinion is written if there's no reference to it. Well, I'm trying to understand how the panel in University of Washington could construe the same sentence, the same phrase of the same section of a statute dramatically differently under Chevron 1 than did two earlier panels. So all you're saying is that you just disagree with the way the case came out. And we're not. No, that's not. We're not in a position just to disregard what was held there, right? Well, of course I disagree. But that's not the argument as to why you get to decide or why. And more frankly, this should be decided by the I hate to say it, by the full court, because you have two different interpretations of the same statute. Go ahead. I'm sorry. So you do agree that there is a procedure in the Ninth Circuit of what we do whenever there's irreconcilable opinions, right, when there's an intra-circuit conflict. Right. And that is to call for an en banc, right? That's right. Now, in University of Washington, none of the judges, there was no judge that ever wanted to hear this case en banc, right? And it was the same issue. Right. But that's because, you know, and I don't want to go back to the facts, but let me do that. In the oral argument, and I don't know who the judges were because they're just you hear the voices, you don't know the names. But when the counsel in that case said, I invite this court to apply a DINA, which, by the way, interprets the statute as requiring eligibility, not funding. As a lawyer reading that who does this kind of work, I almost fell off my chair. And so did the court, because one panelist said two minutes and some odd seconds. And I don't understand your position. Isn't it fatal? Because these aren't enumerated categories. If you're going to tell us to apply a DINA, you're going to lose. Four minutes and some odd seconds into the argument, the court again said, so you're telling me that we should follow a DINA. Doesn't that foreclose your argument? So I guess my view as to why this case came out the way it did is because somebody gave away the store and for some reason, and I still can't explain, invited the court to apply a DINA, which it did. And having been so invited. Are you really asking us to revisit the University of Washington to go, using this case as the platform, to go en banc to overturn UWMC when there was no petition for rehearing and bank either filed or granted? I think there was a hearing petition filed. But the court wouldn't hear it. Well, you know, I spent 10 years in civil appellate. I've never gotten rehearing, you know, maybe once with Judge Bork. We only go about two dozen times a year and we've got 12,000 dispositions. Well, I mean, once you kind of lack standing to ask for rehearing based on a misinterpreted statute. I'm sorry, an interpretation of the statute that you invite the court to adopt. I mean. So then the question becomes, does that determine the law forever? It's possible, but it can be done. But it wasn't done in that case. And now we're kind of stuck because if the panel were to make a sua sponte and bank call in this case, we would have to say we disagree with the reasoning of our colleagues in UWMC and the court should go en banc on this case to use it as the platform or the vehicle to overturn a case that the court didn't choose to revisit back then. I don't. Well, again, I think if you concede the issue that creates the conflict, you're not well situated to ask to be reheard based on a mistake that you invited. And what I say in response to your question, Judge Holman, is that not that I'm asking this court. This court doesn't need to decide even at this juncture what's right or wrong. It needs to realize that six judges said this statute is satisfied by funding, and then three judges in the University of Washington, having been invited to apply the D.C. Circuit's approach, differently, very differently, starkly differently concluded that the statute didn't mean funding. It meant the very thing that this circuit rejected, rejected that argument in the earlier case. So, I mean, it is what it is. It's not the situation. I wish I had argued that case. I hadn't. But that being said, I don't think you sacrifice the well-being of 26 hospitals in a broader case because in some particular case there was a concession that stirred the court, steered the court in that direction. It's interesting. Judge Layton, who I think did a great job trying to dig into a dense case, I don't agree with the outcome, but I admire his analysis and efforts. He said the law has evolved and we're constrained by ADENA. Well, you know, since when is the Ninth Circuit constrained by the D.C. Circuit? But that's what happened. I don't know if I want to get into that philosophical discussion. I don't mean to be philosophical on you, but time has expired. I will give you some time on rebuttal, but you burned up all of your time. So let's hear from the United States. I hope I didn't burn it up. I hope I just used it. Thank you. Well, we asked you lots of questions, which is why I'll give you time on rebuttal. May it please the Court, I'm Teal Miller on behalf of the Acting Secretary. As the Court's query with opposing counsel suggests, University of Washington controls this case. The Court would have to go en banc in order to reverse the district court. And if the en banc court were to reverse the district court, it would create a conflict with the D.C. Circuit and the Third Circuit. You shouldn't do that because the University of Washington decision was correct. It is a complicated area, but it's actually a simple case. The statute means the Medicare DISH provision at issue here means eligible for medical assistance under Title 19, and Title 19 tells us what that means. Now, opposing counsel has suggested that there's a conflict within this Court's cases. I don't think that's right. I think there's a clear through line in the four precedents in this area, Legacy Emanuel, Portland Adventist, Phoenix Memorial, and University of Washington, and that's eligibility for medical assistance. Either you're covered by Medicaid. I think we can thread the cases, as I was asking Mr. Gallant, by looking at the one case that said, well, that dealt with secretarial approval under 1511, and the other case which said that you have to be eligible under either Medicare or Medicaid requirements. I think there's an easy... And conclude here that if you don't meet either of those two categories, then you're not eligible for the reimbursement, to be included in the formula. That's right, Your Honor, and I think Portland Adventist actually, the correct understanding of Portland Adventist is that the Court was taking as background there that 1115 patients were eligible. If you look, this is a quote from the portion of Portland Adventist that describes the situation of people in an expansion project in Oregon. It says, the latter group, who became eligible for services paid for with Medicaid funds by reason of the Secretary's waiver. So the Court was saying, the Secretary's waiver here makes you eligible, and the government said, but the funding comes from something other than Medicaid. And the issue before the Court in Portland Adventist was, where does the funding come from, and does that matter? So eligibility has always been the touchstone in this circuit, and that's correct, because that's the correct way to read eligible for medical assistance under Title XIX, because Title XIX tells us that. So your position is the statute is unambiguous, and we should just enforce the statute? It's unambiguous, and it was correctly decided in the University of Washington, and if the Court disagrees, it has to go on bonk. If the Court has no further questions? Anybody have anything? I'd like to ask some really hard questions, but I can't think of any. We ask that the judgment be affirmed. Okay. No, yeah, yes, yes. I think this puts the rabbit in the hat. The passage that my colleague just read said it's eligible for funding. It didn't say eligible for categories. But what's unclear about that? That's what I'm struggling with. I don't see any ambiguity. What's unclear is, if funding is, is it a service provided for in a state plan for which the federal government provides matching fees? And I just read to you the parts of the state plan under which the federal government provides matching fees for MI and GAU. Now, in Phoenix Memorial, which was the second case in which this Court reiterated that funding established medical assistance under a plan, the Court said, our case involves years prior to 97. These people weren't in the waiver. They weren't receiving any federal funding. And the difference between Portland and Phoenix was, was their money sourced from Title XIX paying for the days. That's what we have here. The Third Circuit, by the way, says it's ambiguous. The government has said, depending on whether it's Monday, Friday, or Tuesday, that it's either ambiguous or unambiguous. I'll concede that it's ambiguous because you can't have four different courts construing this thing in all these different ways and saying each one is clear and trumps the other. Go ahead. So if it's not ambiguous, don't we have to give the Secretary Chevron deference? Well, actually, this Court gave Chevron deference in Portland to the funding rationale and said that was unambiguous. And I'd like to, I'd like to touch, this Court has said it's, twice said it's unambiguous if you're funded, you're receiving assistance under a plan. That's what Judge Oberdorfer said before he was reversed by the D.C. Circuit in Adena. That's what, that's what Judge Ludwig said before he was reversed by the panel in Nazareth. There's plenty of judges who have looked at this, including six judges on this Court, and said, you know, if it's funding as well as if it's eligibility, it's medical assistance under a plan. Mr. Gallant, let me interrupt you. Sure. It sounds to me like what you're asking us to do is to make a slight but fundamental change in the wording of the statute. You want the key statutory section to read, patients who for such days were eligible for funded medical assistance. No, eligible for medical assistance. It depends on what medical assistance means. Medical assistance, to me, means eligible to receive treatment that the federal government is, says you're eligible for. Medical assistance is defined in two different ways in different parts of the statute, which is partly why this Court, I said, it said it's not one, it's not the other, it's both. And medical assistance, Section 1902 and 1903, is anything in a state plan that's paid for is considered medical assistance. That's where we started out before we got to the University of Washington. And if I may, there's one point I want to make that I think is important, and I don't want to walk out of here having omitted this. You know, Portland Adventists said, we want to read this statute in a way that accomplishes Congress's intent. Congress's intent is to protect hospitals that treat lots of poor people. And that's what drove this decision, the decision in Portland, which the Court called Congress's overarching intent. The Supreme Court recently in King v. Burwell said, intent is elevated in status in Chevron analysis. You can't read a statute in a way that disserves the purpose. And the purpose was to protect hospitals that treat poor people for which there's a connection to Medicaid. Have the hospitals ever gone through the services of great firms like yours in D.C. to lobby Congress to change the statute in order to make clear that this category of patients are covered? What Congress did under the Affordable Care Act, which may or may not be on life support, was it declared that anybody up to 138% of the Medicaid level should be deemed eligible for Medicaid. So right now, today, these individuals are not waiver people. They are Medicaid eligible in that sense. But they've always been Medicaid eligible in the funding sense since 1991 and since 1992. But if I may be a little bit pushy, there's one point I really want to make here. Sure. Okay. So Chevron 1, Chevron 2. You know, you can't read the same statute as meaning different things and saying it's clear and unambiguous. Chevron 2, you shouldn't read a statute in a way that undermines its fundamental and overarching purpose. I went back to see what was it that drove this Court to find that all day, all low-income days associated should be considered. And I dug back and took another look at the legislative history, and I found where the proxy came from. It was in the House report. And if I may, Congress said this is the House report, and it's H.R. 99-241, 1985, and it's page 14 and 15. And I think this is what this Court was thinking of the first time around. In developing the adjustment, the committee searched for a proxy measure for low income. The committee reviewed available information from the American Hospital Association and other sources and determined after extensive review that use of Medicaid days as a proxy most accurately reflected the fact that the committee was trying to measure the presence of low-income patients. The committee did not want to impose additional burdens, administrative burdens on hospitals or patients. Therefore, the committee rejected any direct measures of income, and the proxy could easily be implemented in 1996. Now, additional low-income individuals were added to the mix in 87, a year later, when Congress increased the low-income load by providing for Medicaid dish. Congress is talking in language of inclusion and remediation, not let's skunk the hospitals. When I then flip to the next page, if I may, the Congress goes on in the report and says, because of concern that the proxy measure of low income might substantially understate the presence of low-income patients in some hospitals, most particularly public hospitals in states where the Medicaid eligibility standards are stringent, this provision also includes a limit exception, and that's where they also recognize State-only funded days. So what the Secretary now wants is a world in which poor people who are funded only by the State can get your dish. Poor people who are funded by the Feds but are categorically and medically needy can be counted, but poor people who are funded under a State plan who are poorer than the State-funded people should be ignored based on the talismanic incantation of two words that don't exist in the statute, medically necessary and categorically needy. And that's it. I think I've probably burned pretty well now. And I would be ---- Do I have a second or two left? No. No? I think we're good. Thank you very much. It never hurts to ask. Thank you. Pleasure to have you here. The case just argued is submitted, and we will next hear argument in the case of Corvus Energy Limited versus 116-9997 Ontario Limited, number 15-35859.
judges: Tallman, Watford, Benitez